# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KENNETH EARL BURNETT, )
                             )
         **Plaintiff,**     )
                             )
                             )    **Civ. 15-608**
                             )
CAROLYN W. COLVIN, )
**Acting Commissioner of Social** )
**Security,** )
                             )
        **Defendant.**    )

## OPINION

### I. Introduction

This case is before us on appeal from a final decision by the defendant, Commissioner of

Social Security ("the Commissioner"), denying the claim of Plaintiff Kenneth Earl Burnett

("Burnett") for disability insurance benefits and supplemental security income under Title II and

Title XVI of the Social Security Act. Burnett filed his Complaint seeking judicial review

pursuant to 42 U.S.C. § 405(g), [ECF No. 3], and the parties have submitted cross-motions for

summary judgment with briefs in support.[1] [ECF Nos. 10-13]. Burnett also has filed a reply

brief. [ECF No. 14]. For the reasons stated below, we will deny Burnett's motion and grant the

Commissioner's motion, thus affirming the decision that Burnett is not entitled to disability

insurance benefits and supplemental security income.

### II. Procedural History

---

[1] As observed by Oberley v. Colvin, 2014 WL 2457398 at *1 n.1 (W.D.Pa. May 30, 2014), although Federal Rule of
Civil Procedure 56 does not govern the District Court's judicial review of the Commissioner's decision under the
act, cross-motions for summary judgment are employed by the parties to provide a method for consideration of their
respective positions.

Burnett applied for Disability Insurance Benefits and Supplemental Security Income under Title II and Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381-1383f on April 3, 2012, alleging disability as of March 1, 2011 at the age of forty-eight (48) due to bilateral osteoarthritis of the knee, bilateral knee meniscal pathology and scoliosis. Burnett's claim was initially denied on July 9, 2012 and Burnett made a timely written request for hearing on August 8, 2012. Administrative Law Judge ("ALJ") Douglas Cohen held a hearing on October 24, 2013, R. at 27-51, at which Burnett appeared and testified as did Karen Krull, an independent vocational expert. R. at 27. Burnett was represented at the hearing by current counsel, Terry K. Wheeler, Esq. R. at 27.

By decision dated November 14, 2013, R. at 12-20, the ALJ determined that Burnett was not disabled under §§ 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. R. at 12. On the alleged disability onset date of March 1, 2011, Burnett was forty-eight (48) years old, placing him in the age category of younger person, however, as of March 6, 2012, when Burnett turned fifty (50), his age category changed to person closely approaching advanced age under the regulations. 20 C.F.R. §§ 404.1563(c) & (d), 416.963(c) & (d).

The ALJ found that Burnett has the following impairments: bilateral osteoarthritis of the knee, bilateral knee meniscal pathology and scoliosis, which are severe as they cause significant limitation on Burnett's abilities to perform basic work activities. R. at 14. The ALJ also determined that none of Burnett's impairments or combination of impairments meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 15. The ALJ further found that Burnett has the residual functional capacity to perform light

2

work, except that he "must be able to only occasionally climb ramps and stairs only, occasional balancing, stooping and crouching with no crawling or kneeling." R. at 15.

In ruling, the ALJ made the following credibility determination:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

R. at 16.

Regarding his ultimate ruling that Burnett is not disabled, ALJ Cohen stated:

> Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

R. at 20.

Burnett timely filed for review of the ALJ's determination that he was not disabled under the Act, which review was denied by the Appeals Council on March 20, 2015. Thus, the ALJ's decision became the Commissioner's final decision for purposes of review. Having exhausted his administrative remedies, Burnett filed the instant action seeking judicial review of the final decision of the Commissioner of Social Security denying his application. With leave granted May 13, 2015, [ECF No. 13], Burnett proceeds *in forma pauperis*.

### III. Standard of Review

The Congress of the United States provides for judicial review of the Commissioner's denial of a claim for benefits. See 42 U.S.C. § 405(g)(2012). This court must determine whether or not there is substantial evidence which supports the findings of the Commissioner. See id.

"Substantial evidence has been defined as 'more than a mere scintilla,'" Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999) (quoting Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995)), but "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). This standard also has been referred to as "less than a preponderance of evidence but more than a scintilla," Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002), and does not permit the reviewing court to substitute its own conclusions for that of the fact-finder. See id; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry). Nevertheless, "[a]n ALJ must explain the weight given to physician opinions and the degree to which a claimant's testimony is credited." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 362 (3d Cir. 2011). The ALJ's decision will not be reversed if supported by substantial evidence and decided according to correct legal standards. Id. To determine whether a finding is supported by substantial evidence, the district court must review the record as a whole. 5 U.S.C. § 706(1)(F).

**IV. Five-Step Evaluation Process for Determining Disability under the SSA**

Under the SSA, the term "disability" is defined as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months ...

42 U.S.C. § 423. A person is unable to engage in substantial activity when he:

> is not only unable to do his previous work but cannot, considering

4

his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work....

42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A).

In determining whether a claimant is disabled under the SSA, a sequential evaluation process must be applied. 20 C.F.R. § 416.920(a). See McCrea v. Commissioner of Social Security, 370 F.3d 357, 360 (3d Cir. 2004). The evaluation process proceeds as follows. At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity for the relevant time periods; if not, the process proceeds to step two. 20 C.F.R. § 416.920(b). At step two, the Commissioner must determine whether the claimant has a severe impairment or a combination of impairments that is severe. 20 C.F.R. § 416.920(c). If the Commissioner determines that the claimant has a severe impairment, he must then determine whether that impairment meets or equals the criteria of an impairment listed in 20 C.F.R., part 404, Subpart P, Appendix. 1. 20 C.F.R. § 416.920(d).

The ALJ also must determine the claimant's residual functional capacity; that is, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 416.920(e). The ALJ is not required to uncritically accept Plaintiff's complaints. See Chandler, 667 F.3d at 363. The ALJ, as fact finder, has the sole responsibility to weigh a claimant's complaints about his symptoms against the record as a whole. See 20 C.F.R. §§ 404.1529(a), 416.929(a).

If the claimant does not have an impairment which meets or equals the criteria, at step four the Commissioner must determine whether the claimant's impairment or impairments prevent him from performing his past relevant work. 20 C.F.R. § 416.920(f). If so, the

5

Commissioner then must determine, at step five, whether the claimant can perform other work which exists in the national economy, considering his residual functional capacity, age, education and work experience. 20 C.F.R. § 416.920(g). See also McCrea, 370 F.3d at 360; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000). Plaintiff bears the burden of proving that his residual functional capacity or limitations are those which do not allow for any work in the national economy. See Heckler v. Campbell, 461 U.S. 458, 460 (1983); Matthews v. Eldridge, 424 U.S. 319, 336 (1976).

**V. Discussion**

Burnett's challenges center on the ALJ's determination of his residual functional capacity. Burnett argues that the ALJ in determining his residual functional capacity failed to properly consider the medical evidence, giving improper weight to the opinions of various physicians, and that the ALJ did not adequately explain why he found Burnett's testimony less than fully credible. Burnett further argues that the ALJ failed to properly apply the Medical-Vocational Rules, which he argues direct a finding of disability. (Burnett's Brief at 13-14). Burnett seeks summary judgment or, in the alternative, remand for a new hearing. (Burnett's Brief at 14). The Commissioner likewise seeks summary judgment, arguing that the ALJ's decision that Burnett was not disabled is supported by substantial evidence, including that Burnett did not seek treatment until eight months after his alleged onset of disability date, his symptoms improved post-surgery to his satisfaction and that of his treating physician, and he remained active as caretaker for his father. (Commissioner's Brief at 1).

As to the ALJ's consideration of the medical evidence, Burnett specifically argues that the ALJ improperly gave little weight to the opinion of one of Burnett's treating physicians, Dr.

6

Anderson, impermissibly substituting his evaluation for that of the treating physician, (Burnett's Brief at 8-9), and improperly and allegedly gave great weight to the opinions of the state agency medical consultant (Burnett's Brief at 8). We will address each challenge by Burnett in turn by first detailing the medical evidence.

### A. Medical Evidence

As an initial matter, the ALJ noted that Burnett was diagnosed with Heterozygous Factor V Leiden Mutation, R. at 15; Ex. 7F, but that he treats with over the counter aspirin, does not require a specialist and that such has a minimal impact on Burnett's ability to perform work-related activities. Indeed, Burnett makes no mention in his Brief regarding same. Also, noted in the medical records and in the ALJ's determination is Burnett's scoliosis, which was considered by the ALJ and is mentioned by Burnett in his Brief, with the focus, however, being on the condition of his osteoarthritic knees and resulting pain as more fully detailed infra.

### 1. Dr. Mark Stabile

Burnett claims disability from March 1, 2011, as the date when his knee pain became real to him, R. at 33, but only first treated for it in October 2011 with Dr. Stabile, his Primary Care Physician ("PCP"). R. at 33-34. Dr. Stabile's records reflect Burnett's knees were symmetric, non-edematous, and had mild effusion with diagnosis of chondromalacia patella, for which Dr. Stabile then prescribed Naproxen for pain and ambien for resulting difficulty with sleep. R. at 16; R. at 236, 238, Ex. 2F 7-8, 10. X-rays that were ordered at the time revealed as to the right knee mild medial joint space narrowing and minimal patellar spurring and as to the left knee medical compartment joint space narrowing. R. at 222, 223, Ex. 1F 1-2. In an August 2012

7

follow-up visit, Dr. Stabile indicated that Burnett suffered from right and left knee tenderness, noted no other abnormalities, again prescribed Naproxen, yet also suggested short term disability, stated that Burnett was unable to do any physical work due to the arthritis, and stated that he would benefit from knee injections and if not possibly surgery. R. at 16; R. at 271, Ex 5F, 1-2. The ALJ reported that he gave little weight to the opinion that he could not do any physical work due to arthritis. R. at 18.

    2. Dr. Stuart Anderson

Dr. Anderson is Burnett's treating orthopedic surgeon who performed arthroscopic surgery on Burnett's right knee on December 3, 2012. Dr. Anderson's notes reveal that at his first office visit on September 20, 2012, Burnett complained of painful and stiff knees with denial of locking or catching, but that the pain kept him up at night. Regarding Burnett's back, Dr. Anderson's office notes indicated no obvious instability and that his trunk strength was normal. Burnett had full range of motion and bilateral negative straight leg raising, moderate effusions, patella femoral crepitus and discomfort through motion. Dr. Anderson referred Burnett for MRI studies and prescribed ambien. R. at 17; R. at 278, Ex. 6F 7.

The MRI studies revealed regarding his right knee a tear in the posterior horn of the medial meniscus. R. at 17; R. at 272; Ex. 6F at 1. The MRI of the left knee revealed minimal joint effusion probably within normal limits, a possible small radial tear at the junction of the body and posterior horn of the medial meniscus, and mild intrameniscal degeneration involving the posterior horn of the medial meniscus. R. at 17; R. at 274, Ex. 6F at 3. Dr. Anderson's notes from the November 2, 2012 exam reveal that he reviewed the MRI results and discussed

treatment options, with Burnett opting for surgery on the right knee as it was the most symptomatic. R. at 17; R. at 279, Ex. 6F at 8.

Dr. Anderson also provided without any accompanying report a November 2, 2012 Medical Source Statement of Claimant's Ability Form ("form" or "form report") dated November 2, 2012, R. at 292-294, Ex. 6F, which includes the words "Patient has been disabled since," with no indication of a date of onset. The form also indicates that Burnett's reaching is impaired, with no indication of nature and degree, that he can sit for 6 hours in an 8 hour day, that his standing and walking capacity is one hour or less in an 8 hour day, that his capacity to lift and carry frequently is limited to ten pounds, to lift occasionally is limited to 25 pounds, and to carry occasionally is limited to 25 pounds. The ALJ indicated he gave little weight to the form report opinion. R. at 18.

On December 3, 2012, Dr. Anderson performed an arthroscopic surgery on Burnett's right knee with a partial medical and lateral meniscectomy. R at 17; R. at 283, Ex. 6F at 12. The report from Burnett's first post-surgical follow-up visit on December 17, 2012, reflects that Burnett was happy with the early results and had no complaints. Dr. Anderson observed no effusion, satisfactory motion and strength, no joint line tenderness, negative McMurray's,[2] prescribed him ambien for sleep and ordered a rheumatologic workup. R. at 17; R. at 285, Ex. 6F at 14. In the January 29, 2013 follow-up visit, Dr. Anderson noted slow but steady progress and continued improvement with therapy, no complaints, satisfactory motion and strength, no joint line tenderness, negative McMurray's, and no instability. R. at 290, Ex. 6F at 19. Dr. Anderson also noted a negative rheumatologic workup. Similarly, Dr. Anderson's post-surgical office notes from February 25, 2013 indicate that Burnett had full range of motion, no instability,

---

[2] A McMurray's test is used to determine whether the patient has a meniscal tear. See Dorland's Illustrated Medical Dictionary, 1894 (32nd Ed. 2012).

9

minimal symptoms, and had improved right knee following surgery with Burnett being happy and satisfied with the results. R. at 17-18; R. at 291, Ex. 6F at 20. The notes indicate as well that Burnett still had symptoms in his left knee, but that he was caring for his father at that time, was not undergoing further treatment and in the future may wish to seek treatment. R. at 291, Ex. 6F at 20. Burnett sought no further treatment for either knee from his orthopedist.

### 3. Dr. Briana D. Yee-Providence

Due to a change in insurance, subsequent to treating with his PCP Dr. Stabile, Burnett treated with a new PCP, Dr. Yee-Providence. Burnett initially saw Dr. Yee-Providence on April, 8, 2013 for knee pain, indicating that Naprosyn (Naproxyn) was helping him, and that he had a normal gait and no swelling. R. at 301-303, Ex. 7F at 7-9. He was to follow with Dr. Anderson. R. at 304, Ex. 7F at 10. At the May 7, 2013 office visit, Dr. Ye-Providence recommended that Burnett have a functional capacity assessment. R. at 295, Ex. 7F at 1. At the June 4, 2013 office visit regarding Burnett's knee pain, Dr. Yee-Providence's notes reflect that Naprosyn helped significantly with Burnett's discomfort and that Burnett was to follow with Dr. Anderson regarding pain and left knee arthroscopy in the future. R. at 18; 335, Ex. 7F at 41. There was no further treatment with a primary care physician in the medical record after the June 2013 office visit through the date of hearing. R. at 44.

### 4. Dr. Farooq Hassan

Burnett was referred to Dr. Hassan for a rheumatology evaluation. Dr. Hassan's notes from the July 17, 2013 exam provided that there was no swelling or effusion in the knees and good range of motion with mild knee crepitations. R. at 17; 354, Ex. 8F at 8. The notes also reflect that Burnett was complaining of pain and sleep difficulty. Dr. Hassan advised that

Burnett lose weight, engage in low impact aerobics and stretching exercises on a regular basis as well as switching his Naprosyn to Mobic, taking over-the-counter glucosamine/chondroitin, and having him take Flexeril at night. R. at 17; R. at 353, 355, Ex. 8F at 7, 9. Subsequently, at the August 7, 2013 follow-up visit, Dr. Hassan noted the blood work ruled out inflammatory arthritis, he had mild degenerative arthritis, good range of motion, slight improvement in both pain and sleep with change in medication, and again advised low impact aerobics and stretching exercise. R. at 18; R. 357-58, Ex. 8F at 11, 12.

5. Dr. Joseph Kalik

Burnett saw Dr. Kalik, the Consultative Examiner, on June 20, 2012. Dr. Kalik provided a Medical Source Statement of Claimant's Ability Form opining that Burnett was limited to frequent lifting/carrying of 50 pounds and 100 pounds occasionally, standing/walking 6 hours per day, no limit on pushing/pulling, no limit on sitting, and occasionally bending, kneeling, stooping and crouching. R. at 256-257, Ex. 3F at 1-2. Dr. Kalik included with the Medical Source Statement Form both a completed range of motion chart, R. at 258-259, Ex. 3F at 3-4, as well as a Disability Evaluation Report. R. at 18; 260-263, Ex. 3F at 5-8. In the report, Dr. Kalik indicated that Burnett was taking Naprosyn and then Aleve with improvement of symptoms for his knees, occasional back stiffness, and that for his back Burnett had never used a brace, never had therapy and never had surgery. R. at 260, Ex. 3F at 5. Dr. Kalik also observed that Burnett had a normal gait, got on and off the exam table without difficulty, had full range of motion, could perform straight leg raising to 90 degrees, was able to crouch down and stand from crouching position without difficulty, and lumbar flexion was normal at 90 degrees. R. at 16; R. 262-263, Ex. 3F at 7-8. Dr. Kalik noted a slight valgus deformity on both knees, with the ride

11

side being greater, and tenderness on the lower patellar area in both knees, with more on the right. R. at 16; R. 263; Ex. 3F at 8. Further, Dr. Kalik determined that Burnett had osteoarthritis with chondromalacia patella in both knees as well as scoliosis and would recommend physical therapy for the chondromalacia patella and anti-inflammatory medicines. R. at 263, Ex. 3F at 8. The ALJ gave Dr. Kalik's opinion some weight. R. at 18.

6. Dr. Margel Guie

Dr. Guie, a state agency medical consultant, reviewed the medical record and opined in July 9, 2012 based on that review that Burnett could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, could push and/or pull other than the lift and/or carry limits, and could occasionally climb ramps/stairs/ropes/scaffolds, balance, stop, kneel, crouch and crawl. R. at 57, Ex. 1A at 6. The ALJ gave Dr. Guie's opinion some weight. R. at 18.

7. X-Rays of the Spine Regarding Burnett's Scoliosis

There are x-ray reports regarding the lumbar spine in the medical record from May 7, 2013 and July 17, 2013. The May 2013 x-ray report reveals a lumbar dextroscoliosis but no lumbar compression deformities, mild spurring with disc space narrowing, facet sclerosis in the lower spine and mild lower thoracic levoscoliosis. R. at 17; R. 328, Ex. 7F at 34. The July 2013 x-ray report reveals mild endplate degenerative changes, dextroscoliosis and spondylolysis. R. at 17; R. 356, Ex. 8F at 10.

8. The ALJ's Consideration of the Medical Evidence

Other than to state generally that the ALJ failed to properly assess the medical evidence and to then provide in his brief a summary of much of the medical evidence, Burnett does not

12

point to medical evidence that the ALJ improperly ignored. Indeed, in addition to the focus on Burnett's osteoarthritic knees and resulting pain, the ALJ considered his Heterozygous Factor V Leiden Mutation condition as well as his scoliosis in ruling. Our review of the medical record as a whole and the ALJ's decision detailing the various medical records and Burnett's testimony does not reveal any failure to consider the medical evidence in making his decision. Thus, we now turn to the specific challenges made by Burnett.

### B. Burnett's Challenge as to the Weight Given Certain Physicians' Opinions

Burnett argues that the ALJ improperly gave only little weight to Dr. Anderson's opinion of disability and improperly gave great weight to the opinions of the state agency medical consultant. (Burnett's Brief at 8). As an initial matter, we note that the ALJ did not indicate that he gave great weight but that he only gave "some weight" to the opinion of Dr. Margel Guie of the Disability Determination Office and to the opinion of Dr. Kalik, the Consultative Examiner. R. at 18. Moreover, the ALJ explained the weight he gave to the various medical opinions.

Regarding Dr. Anderson, the ALJ indicated that he gave little weight to Dr. Anderson's November 2, 2012 Medical Source Statement of Claimant's Ability Form, R. at 292-294; Ex. 6F, providing that it was inconsistent with Dr. Anderson's own office notes, was only a snapshot of Burnett's perceived abilities and was made less than one month prior to the December 3, 2012 surgery on Burnett's right knee. R. at 18; see Ridenbaugh v. Barnhart, 57 Fed.Appx. 101, 105 (3d Cir. 2003)( inconsistency in treating physician's opinion as compared to treating physician's own findings and other medical evidence). As stated by the Court of Appeals for the Third Circuit in Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cri. 1993), "[f]orm reports in which a

13

physician's obligation is only to check a box or fill in a blank are weak evidence at best." Where such reports are not accompanied by a thorough written report, the reliability of such form reports is considered suspect. Mason, 994 F.2d at 1065 (citing Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir.1986); Green v. Schweiker, 749 F.2d 1066, 1071, n. 3 (3d Cir. 1984)).

Burnett attempts to distinguish Mason in his Reply Brief, arguing that in Mason there was no evidentiary corroboration in the medical record for the form, whereas he contends that here as to Dr. Anderson's form there is. (Reply Brief at 1). Burnett, however, ignores that the Third Circuit's instruction applies where such a form report is not *accompanied* by a thorough written report, which Dr. Anderson's incomplete November 2012 form was not. That the record also was devoid of any other evidentiary corroboration in Mason, directing the result there, does not ameliorate the admonition regarding such a form here. Moreover, the medical records from Burnett's treating physician Dr. Anderson reflect improvement after the December 2012 surgery. The ALJ considered these subsequent records of Burnett's treating physician in determining to give little weight to Dr. Anderson's earlier pre-surgery form, and we find no error.

Burnett also attempts to rely on Brownawell v. Commissioner of Social Security, 554 F.3d 552 (3d Cir. 2008), (Burnett's Brief at 8-9), to argue that the ALJ did not properly credit Dr. Anderson's opinion. Brownawell, involving debilitating headaches combined with depression and anxiety, is inapposite here as it did not involve a form opinion without accompanying report as is considered under Mason, but rather involved multiple opinions by a long-time treating physician, involved an expert opinion relied on by the ALJ that instead contained multiple factual errors, and involved the ALJ's erroneous assumptions not supported by the record.

14

Brownawell, 554 F.3d at 355 (indicating certain consideration to be given long-time treating physician).

Burnett also argues that under Carrier v. Sullivan, 944 F.2d 243, 246 (5th Cir. 1991), the staff reviewing doctor's assessment does not constitute substantial evidence when it conflicts with that of an examining physician. (Burnett Brief at 8). As further explained by the Court of Appeals for the Fifth Circuit in Carrier v. Sullivan, however, the staff reviewing doctor's assessment may not be said to conflict where the ALJ does not fully credit the treating physician's opinion. 944 F.2d at 246. As our Court of Appeals has instructed, "[t]he ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations. See 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c). Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records, see, e.g., 20 C.F.R. § 404.1527(d)(1)-(2), '[t]he law is clear ... that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity,' Brown v. Astrue, 649 F.3d 193, 197 n. 2 (3d Cir.2011). State agent opinions merit significant consideration as well." Chandler, 667 F.3d at 361. Simply put, "[a] ALJ must explain the weight given to physician opinions." Chandler, 667 F.3d at 362.

As to Dr. Kalik and Dr. Guie, Burnett contends that the ALJ improperly gave "great weight" to the opinions of the state agency medical consultant. (Burnett's Brief at 8). To the contrary, the ALJ explained that he gave Dr. Kalik's opinion that Burnett "was limited to frequent lifting/carrying of 50 pounds and 100 pounds occasionally, standing/walking 6 hours per day, no limit on pushing/pulling, no limit on sitting, and occasional posturals," R. at 18; R. 256-265, Ex. 3F, only "some weight," R. at 18, and likewise only gave Dr. Guie's opinion that

15

Burnett had a light residual functional capacity with occasional posturals "some weight." R. at 18; R. 52-69 , Ex. 1A, 2A. Dr. Kalik's form report, as opposed to Dr. Anderson's form report, was accompanied by further documentation and a thorough written report. The ALJ explained the weight he gave these opinions, indicating that they were consistent with the medical evidence, including results of range of motion tests and physical exams by his treating physicians, R. at 18, which bears out on consideration of the record as a whole. Thus, the medical record was supportive of Dr. Guie's and Dr. Kalik's opinions and of the weight afforded by the ALJ in turn.

It is unclear whether Burnett also challenges the weight given to Dr. Stabile, one of his primary care physicians. The Commissioner includes argument regarding the weight given Dr. Stabile as if it is challenged, so we address it here as well. (Commissioner's Brief at 9). The ALJ specified that he gave Dr. Stabile's opinion that Burnett was unable to do any physical work little weight because there were no clinical findings to support disability, Burnett had not treated with the orthopedist as of that time, the only treatment Burnett had undertaken was taking Naprosyn daily, and the opinion pre-dated Burnett's knee surgery, the results of which were reported as satisfactory by Burnett to his treating physician. R. at 16-17.

A fair review of the ALJ's decision and the record as a whole reveals that the ALJ also gave thorough additional consideration to the medical records of Burnett's treating physicians, Dr. Anderson, Dr. Stabile, and Dr. Yee-Providence in reaching his decision and explaining the weight given to opinion in this matter. Thus, although Dr. Anderson's opinion given on the form and Dr. Stabile's statement in the records that Burnett was unable to do any physical work were

16

both given little weight, the records of his treating physicians were given careful thought and consideration.

## C. Determination that Burnett's Statements concerning the Intensity, Persistence and Their Limiting Effects were not entirely Credible

The ALJ determined that Burnett's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Burnett's statements concerning their intensity, persistence and limiting effects were not entirely credible, remarking that he found Burnett's testimony as to this matter incongruous with the medical treatment records. "An ALJ must explain the degree to which a claimant's testimony is credited." Chandler, 667 F.3d at 362. "Although any statements of the individual concerning his or her symptoms must be carefully considered, SSR 96-7pm (July 2, 1996), the ALJ is not required to credit them." Chandler, 667 F.3d at 363 (citing 20 C.F.R. §404.1529(a)). "In concluding that some or all of a claimant's testimony is not credible, the ALJ may rely on discrepant medical evidence and the claimant's inconsistent statements." Jones v. Astrue, 2012 WL 3279256 at * 2 (E.D.Pa. 2012).

In Chandler, for example, the Court of Appeals for the Third Circuit found that the ALJ had substantial evidence to conclude the claimant was not credible regarding her testimony of extreme pain. The claimant indicated that she had extreme pain and even had reported to doctors that it allegedly required her to lie down most of the day, but she also testified at the hearing that she shopped several times per week, cooked dinner, cared for her two children and visited with friends. 667 F.3d at 363.

Here, Burnett testified that his preferred position is to sit in a recliner from either a reclined position to where he will "kick back almost the whole way" for four or five hours a day

17

with his legs elevated to relieve stiffness and pain, R. at 40, 46, and that if he does not sit in this position he stiffens up and experiences increased soreness; he sometimes naps and has difficulty sleeping. R at 40-41, 46. The ALJ explicitly stated that he did not find Burnett fully credible and gave specific reasons as to the basis for his finding, including the medical records, the medication prescribed to and taken by Burnett for pain and sleep, activities he engages in, and his declining to engage in treatment to ameliorate his condition. R. at 15-18; see Ridenbaugh v. Barnhart, 57 Fed.Appx. 101, 105 (3d Cir. 2003)(considering type of pain medication used by claimant and her declining to engage in treatment to ameliorate her impairments in upholding ALJ's decision finding her statements not fully credible).

For example, the ALJ noted in his review of the medical evidence that despite the alleged onset date of March 1, 2011, Burnett did not seek any treatment until October 2011, was only prescribed Naproxen at that time, R. at 16; see also R. at 195; Ex. 6E at 9 (Supplemental Function Questionnaire indicating "pain became real bad around August-October, 2011."), and was prescribed Naproxen at several other subsequent physicians' office visits. In his June 2013 appointment with his new Primary Care Physician, Dr. Yee-Providence, Burnett reported that the Naprosyn helped his pain significantly. R. at 18. The ALJ observed that consulting Dr. Kalik indicated as a result of a June 2012 exam that Burnett had a normal gait, was able to get on and off the exam table without problem and had a full range of motion. R. at 16. Full range of motion was noted by Dr. Anderson both before and after surgery as well. R. at 18. Burnett also did not pursue more aggressive treatment of his knees until September 2012 when he was referred to Dr. Anderson. Moreover, Burnett did not seek treatment from his orthopedist Dr. Anderson after February 2013 to follow up further regarding his right knee or to pursue

treatment as to his left knee, R. at 18, and both he and his treating physician reported positive results to the right knee surgery.

The ALJ also supported his credibility finding by noting that the post-surgical medical records demonstrated that Burnett's condition improved and that he likewise had reported improvement to his treating orthopedic surgeon. Although Burnett later testified at the disability hearing that he had little or no improvement regarding pain or function as to surgical results, during Burnett's surgical follow-up visits with his orthopedic surgeon, Dr. Anderson, in December 2012 and February of 2013, the medical records note respectively that Burnett was happy with the early results and satisfied with the further results. R. at 17. Dr. Anderson noted that in February 2013 that Burnett had full range of motion, no instability, no significant tenderness and improved right knee. R. at 18.

The ALJ additionally observed and the record supports that Dr. Hassan twice encouraged Burnett to engage in low impact aerobics and stretching exercises. R. at 18; R. 355, 358, Ex. 8F, at 9, 12. Finally, as observed by the ALJ and as testified to by Burnett, Burnett acts as a caretaker for his father. R. at 18, 32. This includes Burnett "running" and driving his father around, R. at 32, 39, cutting his father's lawn and looking after his house. R. at 188; Ex. 6E. Burnett also cares for himself, shops, performs chores, such as cleaning, laundry and mowing his own yard, and visits family and attends sporting events. R. at 188-191, Ex. 6E at 2-5 [Claimant's Function Report].

As to Burnett's back pain and scoliosis, although x-rays from May of 2012 did reveal mild lower thoracic levoscoliosis, mild disc spurring in the lumbar region and lumbar dextroscoliosis, he had not seen a medical provider since prior to 2011, did not wear a brace, and

19

Dr. Anderson reported in September 2012 that he had no obvious instability and had normal trunk strength. R. at 17.

In sum, we agree with the Commissioner that the ALJ's credibility assessment properly took into consideration his testimony, the medical record, medication, and Burnett's activities.


### D. Application of the Medical-Vocational Rules

Burnett also argues that the ALJ failed to properly apply the medical-vocational guidelines. The ALJ observed that if Burnett could perform the full range of light work, medical-vocational rules 202.21 and 202.14 would have directed a finding that Burnett was not disabled. R. at 19. The ALJ further indicated, however, that the medical-vocational guidelines properly were used as a framework for decision-making where, as here, he had determined that the claimant cannot perform all or substantially all of the exertional demands of work at a given level of exertion or he has non-exertional limitations. R. at 19; see SSR 83-12.

Regarding application of the Medical-Vocational Rules, Burnett argues first that the medical evidence establishes that his work capability is sedentary at most. Burnett then argues that based on his claimed sedentary level of work capability, he meets GRID rule 201.14 directing a finding of disability as he turned fifty (50) on March 6, 2012, R. at 132, and based on having a high school education with two years of college courses that does not provide for direct entry into skilled work and having past semi-skilled, skills not transferable work history. (Burnett's Brief at 13). As Burnett argues, the regulations provide in determining disability for consideration of "age in combination with [] residual functional capacity, education, and work experience," 20 C.F.R. §§ 404.1563(a), 416.963(a), and further provide that the "we will not

20

apply age categories mechanically in a borderline situation," such as where the claimant is just shy of the next older age category. 20 C.F.R. §§ 404.1563(b), 416.963(b).

The Court recognizes that some flexibility in consideration of age in a borderline situation regarding application of the Medical-vocation guidelines is appropriate and indeed specifically recognized as appropriate by the guidelines. Here, however, Burnett's argument regarding application of the medical-vocational guidelines rests firmly as he states it on a required finding that his residual functional capacity is at most sedentary. (Burnett's Brief at 13). As we have determined that the ALJ's finding that Burnett had the residual functional capacity to perform light work with exceptions is supported by substantial evidence and that the ALJ properly utilized the medical-vocation rules as a framework, Burnett's argument regarding application of the medical-vocational rules is unavailing.


E.  Reliance on Vocational Expert's Testimony

Consistent with the foregoing, we find that the ALJ complied with his duty to consider the medical record and Burnett's testimony, explained the weight given to the physicians and applied the proper legal standard in assessing Burnett's credibility. As the finder of fact, the ALJ is required to review, properly consider and weigh all of the medical records provided concerning the claimant's claims of disability. Fargnoli, 247 F.3d at 42 (citing Dobrowolsky v. Califano, 606 F.2d 403, 406-07 (3d Cir.1979)). The ALJ's residual functional capacity finding was detailed and credited Burnett with numerous limitations. The ALJ also comprehensively reviewed and accounted for the medical evidence in rendering his opinion. The Vocational Expert testified regarding the hypothetical posed that, based on the residual functional capacity

as ultimately found by the ALJ, with considerations of Burnett's age, education, and work experience that jobs exist in significant numbers in the national economy that Burnett could perform, including occupations such as ticket taker, furniture rental clerk, and mail clerk. R. at 49; see also R. at 19-20. Accordingly, the ALJ was entitled to rely on the vocational expert's testimony based on the ALJ's finding of Burnett's residual functional capacity in ultimately finding that Burnett was not disabled. We find that the Commissioner's decision is based on substantial evidence and will not disturb it.

## V. Conclusion

For the foregoing reasons, and based upon our review of the record as a whole, we hold that the decision of the Commissioner that Burnett was not disabled is supported by substantial evidence and, accordingly, an appropriate order will be entered granting the Commissioner's motion for summary judgment and denying Mr. Burnett's motion for summary judgment.

April 14, 2016

Maurice B. Cohill, Jr.
Senior United States District Court Judge